UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GLORIA SPARVERI,                    :

    Plaintiff,                      :

       vs.                         :    No. 3:05cv00376(WIG)

TOWN OF ROCKY HILL,                 :

    Defendant.                      :

----------------------------X

<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Plaintiff, Gloria Sparveri, has brought this action against her former employer, the Town of Rocky Hill, alleging that the Town breached the terms of its Pension Plan when it refused to calculate her pension benefits based upon a hire date that had been adjusted by the Town Manager to account for her part-time and volunteer service to the Town.  The Town denies that she is entitled to additional pension benefits based upon this adjusted hire date and maintains that Plaintiff is entitled only to a lump-sum distribution of her contributions to the Pension Plan plus interest because of a settlement agreement and release that Plaintiff signed when she resigned her employment with the Town.

This matter was tried to the Court over a period of three days.  After due consideration of the evidence presented, the Court hereby renders the following Findings of Fact and Conclusions of Law.

1

<u>FINDINGS OF FACT</u>

1.  Plaintiff, Gloria Sparveri, is a 62-year old woman, who, along with her husband Anthony Sparveri, has lived in the town of Rocky Hill, Connecticut, since 1972.

2.  Plaintiff received her Master's Degree in Behavioral Science in the early 1980's and is a Licensed Professional Clinical Counselor.  Until the early 1990's Plaintiff worked full-time as the Executive Director of Sexual Assault Counseling Services of Middlesex County, providing counseling and advocacy services to victims of crimes, sexual abuse, and domestic violence.

3.  As part of her job, in 1987, during a training session for police officers, she was approached by the Rocky Hill Police Chief, who asked her if she would be willing to provide some counseling to the mother of a murder victim in Rocky Hill.  She agreed to help and soon thereafter, in August 1988, she began working on a volunteer basis with the Police Chief to start a Crisis Intervention Unit ("CIU") for Rocky Hill.  Plaintiff reported to the Police Chief, whose office was on the ground floor of the old Town Hall.

4.  Plaintiff's volunteer job with the Police Department gradually evolved such that she was doing significantly more work with the Police Department, and her hours of work increased substantially.  Plaintiff was on-call for crisis intervention

2

matters 24 hours a day, 7 days a week.  She carried a one-way radio with her at all times so that the Police Department could reach her if she was needed to help with crisis intervention. During this time, she continued to work as the Executive Director of the Middlesex County Sexual Assault Counseling Services, which approved of her work for Rocky Hill because it involved victim services and advocacy.

5.   In October 1994, Plaintiff became a part-time counselor/therapist for the Town of Rocky Hill, providing family, group and/or individual therapy, court advocacy and liaison work, and emergency and crisis intervention.  Her salary was $350/week, based on a 19-hour week at the rate of $18.50 per hour.  Her contract specifically provided that she would not be entitled to any health, life, or pension benefits.  Her contract was signed by Town Manager O. Paul Shew and Police Chief Phillip Dunn.  Her contract was renewed for a year in July 1995 and her salary increased to $360.50/week, still based on a 19-hour work week. Although her contracts were for 19 hours/week, Plaintiff often worked many more hours, probably closer to 30 hours/week on average.  Plaintiff reported her hours on time sheets and received "comp time" for any hours over and above 19 hours/week.

6.   On July 1, 1996, Plaintiff became a full-time employee of the Town, providing not only crisis intervention but also employee assistance ("EAP") to Town employees.  Her yearly salary

was $39,457.60 based upon a 40-hour work week.  Her contract specifically stated that she waived any interest in health and life insurance and pension benefits, although her vacation time, sick time, and holiday time benefits were in accordance with the Town's Personnel Rules for new employees.

7.   On August 8, 1997, Plaintiff received a letter from the Town Manager, Philip R. Dunn, appointing her as the official Employee Assistance Program employee, effective July 1, 1997. She was now eligible for all benefits available to full-time employees, including healthcare and pension benefits.  These benefits were very important to her because her husband did not have health insurance or pension benefits, and for the first time, Plaintiff began contributing to the Pension Plan.

8.   In 1999, Plaintiff was appointed as the Director of Personnel, EAP/CIU, a position created by Nicholas LaRosa, the new Town Manager.  In this capacity, Plaintiff reported directly to LaRosa and had an office directly across the hall from his. Plaintiff's duties were primarily recruitment, EAP, and crisis intervention.  She did not handle payroll, which was done by the Accounting Department.  She also did not have any involvement with pension or retirement benefits, which were handled by the Finance Director Bob Metcalf, and later John Mehr.

9.   Plaintiff had known the LaRosa family for many years as they lived in the same neighborhood.  LaRosa was a former police

4

officer and had a good understanding of the type of crisis
intervention work that Plaintiff performed.  He had also
experienced the death of his son and related to her work because
of that.  LaRosa was aware of Plaintiff's work with the CIU and
her volunteer service and part-time work for the Town.
Plaintiff trusted LaRosa implicitly and considered him to be an
honest man.

   10.  In connection with her work with the Town, Plaintiff
came to know Barbara Gilbert, who had worked for the Town for
many years.  Like Plaintiff, Gilbert had worked for the Town in a
part-time capacity as Clerk of the Town Council from 1974 to
2002.  She also held a part-time job as a technician in the
Town's Assessor's Office for a number of years.  From 1985 to
1992, she worked outside the Town but still served as Clerk of
the Town Council.  In 1992, Gilbert became the Town Clerk, which
was a full-time position.  In 1999, she became Assistant Town
Manager under LaRosa and then Acting Town Manager upon LaRosa's
sudden death in 2002.  On November 12, 2002, she was appointed by
the Town Council to the position of Town Manager, a position she
still holds today.  At that time, she negotiated a change in her
hire date to account for her 18 years of part-time employment
with the Town.   At the time her employment contract was signed,
the Pension Plan did not recognize this amended hire date.  She
was told that the Plan would have to be amended to allow

Participants to buy years of service.  They would also have to prove their eligibility by showing that they worked for more than 20 hours a week for more than 26 weeks a year.

11.  In 2000, Anthony Sparveri, Plaintiff's husband, was appointed to fill a vacancy on the Town Council.  He then ran for election in 2001 and was elected for a two-year term to the Town Council, but lost his bid for re-election in 2003.  While on Town Council, he served as Chairman of the Finance Committee.

12.  Around September 2000, Plaintiff had conversations with both LaRosa and Gilbert about getting credit for her service with the Town before she became a full-time employee.

13.  On September 8, 2000, Gilbert prepared a memorandum for LaRosa seeking to give Town employee Maureen Fazzina credit for one-third of the time that she was employed on a part-time basis, which would affect her vacation, longevity and, ultimately, retirement dates.  LaRosa "OK'd" the memorandum and signed it. Fazzina testified that this agreement did not have any impact on her pension benefits and that Gilbert told her that she would have to buy into the pension to increase her pension years.[1]

14.  Although the evidence is in dispute as to how the memorandum concerning Plaintiff's service time came into

---

[1]  The Court does not find this testimony to be credible for as discussed _infra_, the Guidelines allowing employees to purchase additional pension benefits for their years of part-time service were not adopted until five months later.

existence,[2] the evidence is undisputed that on September 13, 2000, Gilbert prepared a memorandum to LaRosa, which stated as follows:

> It has been brought to my attention that when Gloria Sparveri was hired as a full time employee of the Town she was not given credit for service for the time she was employed part time.  This benefit has been given to

---

[2]   Plaintiff's testimony at trial concerning the sequence of events leading up to this memorandum differed significantly from that of Gilbert.  Plaintiff testified that Town Manager LaRosa, who had been her neighbor since 1972 and with whom she was good friends, was aware of all of her volunteer service to the Town and felt that it was unfair that she was not receiving credit for those years of service.  He wanted to make it up to her and said he would "split the difference," thus giving her credit for six years of service for her thirteen years of part-time service to the Town.  The date of May 1, 1991, was chosen solely by LaRosa. Plaintiff testified that Gilbert, as the Town Clerk, drafted this memorandum.  Plaintiff never saw it before it was signed by LaRosa and never discussed the drafting of the document with Gilbert.  She did admit, however, that she had discussed service time with Gilbert, since Gilbert was looking for the same thing.

Gilbert admits that she prepared this memorandum to LaRosa but testified that she did so only after Plaintiff came to her office with a very similar memorandum relating to another employee, Fazzina, stating that she wanted the same thing. Plaintiff, however, denies ever having seen the Fazzina memorandum.  According to Gilbert, Plaintiff supplied her with the date of May 1, 2001.  Gilbert did not verify this date and states that she was not aware that Plaintiff had ever worked as an unpaid volunteer for the Town.  She gave the memorandum to LaRosa, who signed it, and she never saw it again.  Gilbert had no involvement with implementing the change in Plaintiff's hire date.

Although Gilbert testified that she was not aware that Plaintiff had ever worked as a volunteer, Plaintiff presented evidence that Gilbert, as the Clerk taking minutes at all Town Council meetings, would have been aware of presentations by the Police Chief concerning Plaintiff's volunteer work with the CIU, although these minutes were never introduced into evidence.

> other employees who started working for the
> Town on a part time basis until they could
> secure a full time position.  In fairness to
> Gloria, I believe she should be given credit
> for the time she was employed part time
> thereby adjusting her hire date to 5/1/91.
> The result of this adjustment <u>will have an</u>
> <u>effect on her vacation, longevity and</u>
> <u>ultimately retirement dates.</u>
>
> Thank you for giving this matter
> consideration.

(Pl.'s Ex. 1)(emphasis added).  The memorandum was "OK'd" and
signed by LaRosa on September 20, 2000.

15.  Plaintiff understood that this change in her hire date
would impact all of her benefits, including her pension, which
she equated with her "retirement," although she conceded that she
had no knowledge as to how the Town was going to implement the
change in her retirement date.  The Town did give her a longevity
bonus of $500 based upon her new hire date, it increased her
vacation time, and decreased the co-pay for her health insurance
from 10% to 5%.[3]  The mechanics of changing her hire date were
performed by Beth Hajek in the Town's Accounting Department.

16.  Plaintiff testified that this September 13, 2000,
memorandum impacted her attitude and conduct toward her job.  It

---

[3]  Although Plaintiff did not testify to the impact of the
adjusted hire date on her sick leave, it appears to the Court
that she must have received sick time for these additional six
years of service.  When Plaintiff resigned in 2003, she had 830
hours of unused sick time, which is nearly 21 weeks, far more
than could be accumulated in the seven years that she worked as a
full-time employee.

8

also impacted her personal planning for her own retirement.

17.  Plaintiff was of the belief that LaRosa, as the Town Manager, had the authority to change her hire date.  He was also the Plan Administrator for the Pension Plan.

18.  The Town of Rocky Hill has a town manager form of government.  The town electors elect a Mayor and eight Council members, who comprise the Town Council, and serve for a term of two years.  (Town Charter § C4-1.)  The Town Council is the governing and legislative body of the Town and, *inter alia*, has final authority concerning the Town's budget.  (Town Charter § C4-2.)  The Town Council is also responsible for appointing the Town Clerk for an indefinite term, who acts as the clerk for the Council, keeps a journal of its proceedings, which are a public record, and performs such other duties as are assigned by the Town Charter of by action of the Council.  (Town Charter § C6-1.)

19.  The Town Council is also responsible for appointing the Town Manager, who is the chief executive officer of the Town and serves at the pleasure of the Council for an indefinite term. (Town Charter § C5-1.)  The Town Manager is directly responsible to the Council for the supervision and administration of all commissions, boards, departments, offices and agencies of the Town, except those elected by the people, appointed by the Council, or appointed by a regional, state, or federal authority. (Town Charter § C5-2.)  The Town Manager is also responsible for

9

appointing all department heads and other offices and employees of the Town and may remove all of those over whom he or she has the power of appointment.  (Town Charter § C5-3.)  One such department is the Finance Department, created by the Town Charter, headed by a Director of Finance, who is appointed and may be removed by the Town Manager.  (Town Charter § C7-1.)  The Town Manager also appoints the Personnel Director, who is responsible for administering the personnel affairs of the Town and making personnel recommendations to the Council and Town Manager.  The Town Manager is also required to prepare a proposed budget for each fiscal year, which is then submitted to the Town Council for a public budget hearing and approval.  (Town Charter § C9-3.)

20.  Under the Town Charter, the Council may provide by ordinance for a system of retirement allowances for the Town's regular, full-time, paid employees and for contributions by employees and the Town to a fund from which allowances shall be paid.  (Town Charter § C9-5.)

21.  The Town of Rocky Hill established the Town of Rocky Hill Pension Plan for Regular Employees (the "Pension Plan" or "Plan") effective September 1, 1968, to provide retirement income benefits for certain of its employees.  The Plan was amended several times.  Effective September 1, 1997, the Pension Plan was amended and restated in its entirety.  The version of the Pension

10

Plan relevant to this action bears a date of December 29, 2000,
and was signed by Town Manager LaRosa on behalf of the Town on
May 8, 2001.  The Town Manager is the Administrator and Trustee
of the Pension Plan.

22.  Under the terms of the Pension Plan, any employee whose
customary employment with the Town is for not more than 20 hours
in any one week and not more than five months in a calendar year
is excluded from the definition of "eligible employee."  (Pension
Plan § 1.13.)  The "normal retirement age" under the Pension Plan
is the employee's 62nd birthday or the fifth anniversary of the
date he becomes a Participant, if later.  (Id. § 1.19.)  The Plan
defines "Credited Service" as "the number of full years and
completed months of Continuous Service with the Employer, as
determined by the Employer, completed by the Participant from his
date of employment to the date of his termination of employment
or actual retirement."  (Id. § 3.03(a)(emphasis added).)

23.  The Plan allows for the purchase in a lump-sum payment
of "additional Credited Service" by non-bargaining employees "for
any full time employment with the Employer, a municipality in
Connecticut, or periods of active military service, at no cost to
the Town."  (Id. § 3.15 (emphasis added).)  To do so, an employee
is required to submit a request in writing no later than six
months from the date of hire, or if already a Participant, no
later than six months following the adoption of this Plan

11

restatement.  (Id.)  The additional amount of Credited Service is then used in the calculation of the final benefit provided the Participant is eligible for a pension based on actual Credited Service with the Employer.  (Id.)

24.  The Plan further provides that the "right of a Participant to his normal retirement Pension shall be nonforfeitable upon the Participant attaining his Normal Retirement Age."  (Id. § 4.01(a)(emphasis added).)  The "normal retirement Pension payable to a Participant upon retirement on his Normal Retirement Date" is a single-life annuity with 120 guaranteed payments.  (Id. § 4.01(b).)

25.  The Vesting provisions of the Plan provide that:

> (a) A Participant shall be vested in, and have a nonforfeitable right to, a percentage of his Accrued Benefit derived from Employer contributions upon completion of Vesting Service as stated below, which is 5 years or more of Credited Service, per subsection (b). If the Participant's employment is subsequently terminated for reasons other than retirement or death, he shall be eligible for a vested Pension after the employer receives his written application for his Pension.

> (e) A Participant who is vested in his Accrued Benefit and who terminates employment with the Employer prior to his Early or Normal Retirement Date may elect a refund of his own contributions plus interest. . . . Election of such a refund shall revoke all vested rights to which the terminated employee may have been entitled under the provision of this Plan and shall be in lieu of all other benefits under this Plan.

12

(Id. § 4.04 (emphasis added).)   Additionally, section 6.03(b)
provides that "[e]ach Participant shall at all times and under
all circumstances remain 100 percent vested in the accumulated
value of his own contributions under this Plan." (Id. § 6.03(b).)

26.   Article V of the Plan sets forth various forms of
payment for pension benefits, including monthly installments for
life, with 120 payments guaranteed, which was the automatic form
of payment.   Additionally, the Plan provides three other optional
forms of payments.   (Id., Art. V, §§ 5.01, 5.02.)

27.   The Summary Plan Description of Regular Town Employees
Pension Plan, dated May 2000 ("SPD"), defines "Credited Service"
as an employee's full years and completed months of "Continuous
Service," which, in turn, is defined as an employee's
uninterrupted employment by the Town as an "eligible employee."
An "eligible employee" is a regular, full-time employee
(excluding certain occupations not relevant here), who is
actively working for the Town and who works at least 20 hours
weekly throughout the year.   (SPD § 1 at 1; § 3 at 2, 3.)   The
SPD provides that an eligible employee may elect an early
retirement date if he has attained the age of 55 and has
completed five years[4] of Credited Service.   (Id. § 4 at 4.)   The
SPD states that "Credited Service" is also used to determine any

_____

[4]   The SPD states that ten years of Credited Service are
required.   Testimony at trial corrected the required years of
Credited Service to five years.

permanent right an employee has earned to his benefit if he should leave his employment before his Normal Retirement Date. (Id. § 5 at 6.)  The SPD further provides that when an employee retires, he will receive his benefit in the form of a Ten Year Certain and Life Annuity unless he elects otherwise.  (Id. § 6 at 10.)  The SPD then describes optional forms of annuity payments. (Id. § 6 at 11.)  If an employee terminates his employment before he retires, his rights to the benefits he has accrued are determined by the Plan's vesting schedule, which is 100% after five years[5] of Credited Service.  (Id. § 8 at 13.)  If an employee terminates his employment after he is vested, he is entitled to receive the retirement benefit based upon his Credited Service as of his date of termination.  (Id. § 8 at 14.) If, however, an employee terminates his employment and elects to withdraw his basic contributions from the Plan, he loses the right to the retirement benefit credited to him by the Town's contributions regardless of the vested percentage he has earned. (Id. § 10 at 16.)

28.  On February 27, 2001, the Town adopted Guidelines for Converting Part-time Service for Pension Purposes.  This was the first time such conversion had been permitted.  Under the Guidelines, an employee must have been a full-time employee for five years before seeking credit for part-time service;

---

[5]  See Note 4, supra.

volunteers are excluded; and the employee must have worked at least 15 hours/week and at least 780 hours/year.  Under the Guidelines, the part-time hours would be converted to full-time hours based on the number of hours worked, and the employee is required to pay his contribution in the time frame set by the Town Manager in consultation with the Director of Finance and the Pension Committee, with the Pension Plan absorbing any additional cost.  This was a one-time option.  The Guidelines were signed by the Town Manager and the Pension Committee.  Gilbert and Plaintiff were members of the Pension Committee at this time, although Plaintiff testified that she never attended the meetings and that she had never heard about the new Guidelines.   No one ever told her that, in order to get credit for additional years of service, she would have to pay into the Pension Plan.

29.  Plaintiff's last day of work with the Town was on June 23, 2003.  Gilbert and Attorney Michael Rose met with her that day and gave her the choice of having her employment terminated for cause or resigning.  This was a very difficult meeting for both Plaintiff and Gilbert, who had known each other since at least the early 1990's and who had worked closely together at times.  Plaintiff chose to resign in exchange for a severance package.  She was very upset and abruptly left the meeting.  Thereafter, her husband acted as her intermediary in negotiating her severance package with Gilbert.

15

30.   During these negotiations, Gilbert never asked that Plaintiff give up any pension benefits.   The entire focus of the discussions between Gilbert and Anthony Sparveri was on Plaintiff's job, nothing else.

31.   The following day, Gilbert gave Anthony Sparveri the Settlement Agreement that had been prepared by Attorney Rose along with Attachment A, which was prepared by Gilbert.[6] Plaintiff reviewed the Agreement and made numerous hand-written changes, including crossing out almost all references to "release and covenant not to sue," which changes she dated[7] and initialed. Plaintiff testified that, although the Agreement stated that she had 21 days to consider it, she was told that she had to give the Town her letter of resignation within 24 hours.

32.   Plaintiff believed that in signing this Settlement

---

[6]   According to Plaintiff, Attachment A, which is referred to in the Agreement, was part of the Agreement when she received it.   Anthony Sparveri also testified that Attachment A was part of the Agreement that Gilbert gave to him.   According to Gilbert, however, she typed Attachment A from notes supplied to her by Plaintiff's husband after Plaintiff had reviewed the Agreement. Attorney Rose testified that Gilbert told him that she was working on Attachment A, which was to tie up the "loose ends" of the Agreement.   The Court finds it more credible that Attachment A was part of the Agreement when it was given to Plaintiff.   It listed all of the consideration that Plaintiff was receiving from the Town, other than her severance pay and insurance benefits. It does not make sense that the Agreement would have been given to her without this attachment.

[7]   Plaintiff dated the Agreement July 1, 2003, although she signed it around June 25th.   According to Plaintiff, Gilbert had instructed her husband to have the Agreement dated July 1, 2003.

Agreement she was giving up her job in exchange for six months of severance pay, which was approximately $40,000, and certain other benefits that the Town would provide.  She did not believe that she was giving up anything else other than her job.

33.  Attachment A lists the additional consideration to be provided by the Town, which included:

(1)  Pink Slip

(2)  Letter of Recommendation

(3)  Carryover Vacation time (68 hours)

(4)  Earned Vacation time for 2003 (176 hours)

(5)  Payment for unused sick time (40% of 830 hours)

(6)  Withdrawal of 457 contribution in accordance with plan *(at a later date)*

(7)  Withdrawal from Pension plan in accordance with plan *(at a later date)*

(*8*)  *Full payroll for the week of 6/27/03, due 7/3/03*

(*9*)  *Biweekly payroll severance beginning 7/17/03 for six (6) months*

(*10*)  *(2) person health & dental insurance for 12 months to 7/4/04*

(*11*)  *Gloria Sparveri will not be precluded from attaining employment with the Town in the future*

(Attachment A to Settlement Agreement (italics denote handwritten portions)).

34.  Plaintiff wrote items 8 through 11 on Attachment A, which are redundant of other provisions in the body of the Agreement.  The evidence is in dispute as to whether Plaintiff or

17

Gilbert wrote "at a later date" at the end of items 6 and 7 and when this was written.[8]

35.   Plaintiff never discussed giving up any of her pension rights as part of the Settlement Agreement.   She understood Item 7 to mean that she would have to withdraw from the Pension Plan in accordance with the Plan at a later date, but she did not know what the provisions of the Plan were.   She did not have an exit interview.   She knew she had made contributions to the Pension Plan but she did not know what her pension benefits were.   She did not understand this provision to mean that she would have to take a lump sum distribution equal to her contributions plus interest.   Had she known that she was entitled to an annuity under the Pension Plan at the time she signed that Agreement, she would not have agreed to give that up.   This provision was similar to Item 6 regarding her 457 deferred compensation,[9] which she withdrew at a later date.   She also did not believe she was giving up the benefit of her agreement with LaRosa concerning her adjusted hire date.   No one asked her to give up that benefit.

36.   Plaintiff did not discuss the Settlement Agreement with

---

[8]   According to Plaintiff and Anthony Sparveri, Gilbert wrote these words.   Gilbert does not recall.

[9]   A 457 Plan is a deferred compensation plan under Internal Revenue Code § 457, available for certain state and local governments and tax-exempt non-governmental entities, which allows employees of sponsoring organizations to defer income taxation on retirement savings into future years. http://www.irs.gov/retirement/article/0,,id=172437,00.html.

a lawyer.  She did not feel that she had time, and the Town never suggested that she get a lawyer.

37.  After Plaintiff signed the Agreement, her husband took it to Gilbert who then signed it and gave him a copy for Plaintiff.  Although the Agreement required both of their signatures to be notarized, neither Plaintiff nor Gilbert had their signatures notarized.  Gilbert also did not initial any of the handwritten changes made by Plaintiff.

38.  Pursuant to this Agreement, the Town paid Plaintiff her six months of severance pay and provided health and dental insurance for one year.  The Town gave her a pink slip so that she could collect unemployment after her severance payments stopped, and provided her with a letter of recommendation.  The Town paid her 68 hours of carryover vacation time, 176 hours of unused vacation time, and 40% of 830 hours of unused sick time. At a later date, Plaintiff withdrew her 457 deferred compensation contributions.

39.  On March 29, 2004, Plaintiff sent John Mehr, the Town's Finance Director, an email stating that she would like to withdraw her pension contributions from 1997 to 2003 under the Town's Pension Plan.  She requested her current balance in the Pension Plan and inquired as to what she needed to do to withdraw and close this out.  She stated that Mehr might want to look at her separation Agreement and noted that it stated in Attachment A

that she would be doing this later.  At the time Plaintiff wrote this email, she did not know that she was entitled to an annuity.

40.  Mehr responded that she did qualify for a pension, and he enclosed the Pension Retirement Application with a separate calculation of her estimated monthly pension benefit, entitled "Pension Estimates."  It was prepared by Hajek, an associate accountant with the Town and the Pension Plan coordinator.  She based this estimate on Plaintiff's six years of credited pension years, rather than using Plaintiff's adjusted hire date.  According to her calculations, Plaintiff's monthly benefit at age 62 would be $669.96, and $502.47 at age 57, her age at the time.  Mehr did not check Plaintiff's Settlement Agreement, but even if he had, he does not know that he would have responded any differently.

41.  When Plaintiff received this response from Mehr, she made an educated decision that she did not want to take a lump-sum distribution, and she did not sign the application to withdraw her contributions.

42.  When Plaintiff saw the "6" years, it triggered the LaRosa memo, which she then retrieved.

43.  She also received another document in the package saying that she was eligible to purchase 10-year health insurance, and she wondered why she would be eligible for this if "they" were right about the six years.

44.   In response to this memo from Mehr, Plaintiff sought legal advice.

45.   Hajek testified that her calculations were merely approximations based upon a 10-year certain annuity.  There are many different annuities from which a Plan Participant may choose.  To get a precise calculation, a Participant would have to apply for benefits and the pension company would then make the calculations.  In preparing these calculations, she used records that she keeps on all Plan Participants, which include the date the employee became a "pensioned employee."

46.   In her capacity as the payroll specialist for the Town, Hajek had received the September 13, 2000 memorandum adjusting Plaintiff's hire date and placed it in Plaintiff's payroll file. She adjusted Plaintiff's hire date for purposes of her vacation, longevity, and health insurance, even though health insurance was not specifically mentioned in the memorandum.  She understood that a change in an employee's hire date would affect all of his or her benefits except pension benefits.  She did not make an adjustment in Plaintiff's hire date for purposes of her pension because of the cost factor to the Town.  She testified that Plaintiff would had to have purchased additional years of Pension benefits.  She conceded that she gave no effect to the words in the memorandum "will have an effect . . . ultimately [on her] retirement date."

21

47.  Hajek testified that the Pension Plan booklet was provided to an employee if he or she requested one, but there was no evidence that a booklet was provided to every employee on their dates of hire or at any other time.  There was no evidence that Plaintiff ever received this document.

48.  Plaintiff has not filed an application to receive a pension of any kind, and the Town has not paid her any pension benefits, either as a lump sum or as an annuity based on her actual or adjusted hire date.

49.  In 2005, the Town Council adjusted Gilbert's hire date for Pension Plan purposes, giving her credit for some of her part-time service back to 1985.  She did not have to purchase these additional years.  Instead the Town paid for them.

CONCLUSIONS OF LAW

A.   Jurisdiction

1.  Plaintiff originally filed this action in state court, asserting a federal claim under 42 U.S.C. § 1983 for the Town's alleged violation of her Fourteenth Amendment right not to be deprived of property without due process of law, and a state-law breach of contract claim for the Town's alleged violation of the terms of the Pension Plan, when it refused to use her adjusted hire date of May 1, 1991, in calculating her pension benefits.  Defendant then removed this action to federal court pursuant to 28 U.S.C. § 1441.  By Ruling dated October 18, 2005, the Hon.

Janet C. Hall dismissed Plaintiff's § 1983 claim.  The Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367.

2.   The parties have consented to the jurisdiction of this Magistrate Judge.  28 U.S.C § 636(c)(1).  Thus, this is not a Recommended Ruling but a final decision of the Court.

B.  Principles of Contract Construction Under Connecticut Law

3.   "A contract is interpreted by the intent of the parties expressed in the language of the agreement." Topf v. Warnaco, Inc., 942 F. Supp. 762, 767 (D. Conn. 1996).  If the language of the contract is ambiguous, the intent of the parties becomes a question of fact.  Id.; see also Gaudio v. Griffin Health Servs. Corp., 249 Conn. 523, 533 (1999); Bead Chain Mfg. Co. v. Saxton Prods., Inc., 183 Conn. 266, 274-75 (1981).  However, "[w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law" for the Court to decide.  Thompson & Peck, Inc. v. Harbor Marine Contracting Corp., 203 Conn. 123, 131 (1987). When the terms of an agreement are clear, "there is no room for construction" of the language.  Levine v. Massey, 232 Conn. 272, 277-78 (1995); see also HLO Land Ownership Assocs. Ltd. P'ship v. City of Hartford, 248 Conn. 350, 356-57 (1999).

4.   Under Connecticut law, when only one interpretation of contract language is possible, the Court need not look outside

23

the four corners of the document itself.  DeCarlo & Doll, Inc. v. Dilozir, 45 Conn. App. 633, 638-39 (1997).  The circumstances surrounding the making of the contract, the purposes the parties sought to accomplish, and their motives in making the contract cannot establish an intent contrary to the plain meaning of the language in the contract.  Id.  Moreover, the Court will not torture words to impart an ambiguity where the ordinary meaning of the words leaves no room for ambiguity.  Ambiguity must arise from the language of the contract, not from the subjective interpretations of the parties.  Id.; Executive Airlines v. Electric Boat Corp., 271 F. Supp. 2d 392, 395 (D. Conn. 2003); Sanitary Servs. Corp. v. Greenfield Village Ass'n, Inc., 36 Conn. App. 395, 399 (1994).

5.   A party may not create ambiguity in otherwise plain language by urging different interpretations of the agreement in the course of litigation.  Lee v. BSB Greenwich Mortgage Ltd. P'ship, 267 F.3d 172, 178 (2d Cir. 2001) (applying Connecticut law).  Any ambiguity in the contract must emanate from the language used in the contract rather than one party's subjective perception of its terms.  Id. at 179.

6.   The law is also clear that a contract includes not only what is expressly stated therein, but also what is necessarily implied from the language used.  CAS Constr. Co. v. Town of East Hartford, 82 Conn. App. 543, 552-53 (2004); Foley v. Huntington

Co., 42 Conn. App. 712, 729, cert. denied, 239 Conn. 931 (1996).

7.   The law of contract interpretation militates against interpreting a contract in a manner that renders a provision superfluous.  CAS Constr., 82 Conn. App. at 553; United Illuminating Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 674 (2002).

8.   "When interpreting a contract, [the Court] must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result."  R.T. Vanderbilt Co. v. Continental Cas. Co., 273 Conn. 448, 462 (2005) (quoting O'Brien v. United States Fid. & Guar. Co., 235 Conn. 837, 843 (1996)).

9.   "[A] court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract, unless the contract is voidable on grounds such as mistake, fraud or unconscionability."  Gibson v. Capano, 241 Conn. 725, 730-31 (1997).

C.  The September 13, 2000 Memorandum

10.   Plaintiff contends that the September 13, 2000 Memorandum, signed by LaRosa created a binding obligation on the Town to use her adjusted hire date of May 1, 1991, in calculating her pension benefits under the Pension Plan.  The Town responds

that the Memorandum is ambiguous, that Plaintiff gave no consideration for the benefits she received, that the Town Manager had no authority to give Plaintiff credit for these additional years of service in contravention of the Plan, and that Plaintiff has "unclean hands" and is not entitled to the equitable relief that she seeks.  Alternatively, the Town asserts that Plaintiff released her rights under this agreement when she entered into the Settlement Agreement, in which she allegedly agreed to withdraw only her contributions plus interest from the Plan.

11.  In 1999, LaRosa, as the Town Manager, was the Chief Executive Officer of the Town.  (Town Charter § C5-1.)  He had the authority to appoint and fire all department heads and other officers and employees of the Town (id. § C5-3), including the Personnel Director.  He was also vested with the powers and duties conferred upon chief executive officers of towns by the Connecticut General Statutes.  (Id. § C5-2; Conn. Gen. Stat. §§ 7-99, 7-12.)

12.  The Court finds that in September 2000, LaRosa as the Town Manager had the authority to change the hire dates of Town employees to give them credit for prior years of service to the Town.

13.  The Court further holds that the September 13, 2000 Memorandum, prepared by Gilbert and approved by Town Manager

LaRosa on September 20, 2000, was a valid and binding contract, supported by adequate consideration on the part of Plaintiff. This offer from the Town of adjusting Plaintiff's hire date in recognition of her years of service to the Town prior to her becoming a full-time employee was made for the obvious purpose of securing Plaintiff's good will, loyalty, and continuing commitment to her job as Personnel Director.  Plaintiff provided this consideration through her continued service to the Town, and an enforceable contract was created.  See Tilbert v. Eagle Lock Co., 116 Conn. 357 (1933) (holding that "[t]he essentials of a consideration [were] satisfied" where an employer offered death benefit certificates to its employees to secure their good will, loyalty, and efficiency, and to minimize turn-over, and where the employees accepted by remaining in the employ and giving up the right to terminate their employment and go elsewhere); Borden v. Skinner Chuck Co., 21 Conn. Supp. 184, 190-91 (Conn. Super. Ct. 1958) (holding that "if the effect of an executory promise of a profit is to induce the employee to refrain from quitting, and in reliance thereon he does refrain, then there is sufficient consideration to support an enforceable contract"); see also Gronlund v. Church & Dwight Co., 514 F. Supp. 1304, 1310-11 (S.D.N.Y. 1981) (holding that continued service by an at-will employee is sufficient consideration for contractual entitlement to previously promised severance pay and bonus); Habeck v.

MacDonald, 520 N.W.2d 808, 811 (N.D. 1994) ("It is generally recognized that continuing to provide services, when the party is free to discontinue those services, constitutes good consideration for modification of the parties' contract," including the employer's agreement to contribute to a pension plan).

14.  Recognizing its contractual obligations, the Town changed Plaintiff's hire date for purposes of her receipt of employee benefits, including her longevity bonus and her vacation time, and even her health insurance, although this was not specifically mentioned in the Memorandum.  Similar agreements had been made with other employees, including Fazzina and later Gilbert, and their hire dates were likewise changed for purposes of these employee benefits.

15.  The only part of this agreement that was not implemented by the Town was the provision that the adjustment of Plaintiff's hire date "will have an effect" "ultimately [on her] retirement date[]."  The Town gave this provision no effect and argues that the term "ultimately" meant that "if something happened," e.g., if the Pension Plan were amended and Plaintiff qualified, the change in her hire date would have an effect. Plaintiff asks the Court to interpret this phrase to not only increase her years of Credited Service under the Pension Plan, but also to require the Town to pay for these additional years of

28

service.  The Court disagrees with both interpretations.

16.  Under Connecticut law, any ambiguity in a contract must arise from the language of the contract itself and not based on the subjective interpretations of the parties.  DeCarlo & Doll, Inc., 45 Conn. App. at 638-39 (1997).  Additionally, the Court will not torture words to impart an ambiguity where the ordinary meaning of the words leaves no room for ambiguity.  Id.; Executive Airlines, 271 F. Supp. 2d at 395.

17.  The dictionary definition of "ultimately" is "in the ultimate stage, in the end, at last, finally, basically, fundamentally."  Webster's Third New International Dictionary 2479 (3d ed. 1993).  And, "ultimate" is defined as "most remote in space or time," "last in progression," "eventual," "extreme."  Id.  Thus, as used in the September 2000 Memorandum, the term "ultimately" meant that her adjusted hire date would affect her retirement date not immediately, as with the other benefits, but eventually at some remote time in the future, i.e., ultimately, when she retired.

18.  Additionally, the Memorandum used the phrase "retirement date," not "pension benefits," as Plaintiff suggests.  "Retirement date" means exactly what it says, i.e., the date an employee retires.

19.  Plaintiff argues that for the change in Plaintiff's hire date to have an "effect" on her retirement date, it must be

29

interpreted to mean that she would be eligible to receive an increased pension based on these extra years of service. Otherwise, she asserts, it confers no benefit whatsoever. The Court disagrees with this interpretation, which tortures the plain language of the Memorandum.

20. The Memorandum stated nothing more than that the change in her hire date would ultimately have an effect on her retirement date. Under the terms of the Plan, in September 2000, Plaintiff could not retire until she had five years of Credited Service and reached the age of 55, which would have been July 1, 2002. But, using an adjusted hire date, Plaintiff would have her five years of service and could take early retirement as soon as she reached the age of 55. Thus, it would affect her retirement date by allowing her to retire early, if she so chose, but the Memorandum said nothing about increasing her pension benefits.

21. This interpretation is also consistent with the language of the Plan, which provides that "Credited Sevice means the number of full years and completed months of Continuous Service with the Employer, <u>as determined by the Employer</u>, completed by a Participant from his date of employment to the date of his termination of employment or actual retirement, whichever is applicable." (Plan § 3.03(a) (emphasis added).) The Plan even gives the Employer the discretion to count as Credited Service any period up to two years during which an

employee is on an approved leave of absence.  Thus, contrary to
Defendant's argument that an employee could not receive Credited
Service for years in which he or she did not work at least 20
hours/week, the Plan gave the employer the discretion to count up
to two years of service when an employee was absent from the
workplace altogether on an approved leave of absence and leaves
the determination of the years of Credited Service for the
employer.

22.  Thus, the Town's agreement to adjust Plaintiff's hire
date did confer a benefit on her in terms of her retirement.
But, changing her retirement date in no way obligated the Town to
purchase these additional years of pension benefits at no cost to
Plaintiff.

23.  Plaintiff argues that no one told her that she would
have to purchase the additional years of service.  That may be
so, but no one told her that the Town would pay for these years
of service either, and there is no evidence that the Town changed
its contributions to meet the funding requirements to account for
her additional years of service.

24.  Moreover, there is nothing in the Memorandum, or in any
of the discussions between Plaintiff and LaRosa or Gilbert
leading up to its preparation, that mentioned the Pension Plan or
Pension benefits.  Plaintiff repeatedly testified that, although
she knew there was a Pension Plan, she was not aware of the terms

of the Plan.  Further, at the time this Memorandum was signed,
the only provision in the Plan for purchasing additional years of
service did not even apply to part-time service.

25.  Thus, the Court concludes that the September 2000
Memorandum, signed by LaRosa, was a binding contract, supported
by adequate consideration between the Town and Plaintiff.  The
Court finds that the plain language of the Memorandum means that
Plaintiff's adjusted hire date would ultimately have an effect on
her retirement date, if she chose to retire early, by giving her
credit for additional years of service.  The Memorandum, however,
did not in any way obligate the Town to purchase additional years
of service for Plaintiff under the Pension Plan.

26.  The Town insists that Plaintiff cannot obtain equitable
relief with respect to an adjustment of her hire date for pension
purposes because she has "unclean hands," having either
misrepresented her years of volunteer service to Gilbert or
having knowledge that she was getting credit for years she did
not deserve.  The Court finds that the evidence does not support
a finding in either regard.  The evidence is clear that Gilbert
drafted the memorandum, which was almost identical to a
memorandum regarding Fazzina drafted less than a week earlier.
The Court finds that Plaintiff neither made any
misrepresentations concerning her volunteer work nor knowingly
failed to report an error in LaRosa's giving her half credit for

32

her volunteer years.

D.   The Settlement Agreement

27.   The Town argues that even if the Court finds that the September 2000 Memorandum was a binding contract, Plaintiff waived her rights when she signed the Settlement Agreement or, alternatively, that she relinquished all of her rights to her pension benefits other than her right to receive a refund of her contributions plus interest based on the Settlement Agreement that she signed.  The Town bears the burden of proof on this affirmative defense.

28.   The Court agrees with Plaintiff's counsel's characterization of the Settlement Agreement as "generally a shambles," riddled with cross-outs, mentioning a law firm that had no involvement with this matter, and obviously the product of a hurried "cut-and-paste" from another settlement.  (Jt. Trial Mem. at 17.)

29.   Nevertheless, it is a binding contract, supported by consideration on both sides.  Plaintiff gave up her job and released the Town for any and all claims, known and unknown, that she might have against the Town as of the date of the execution of the Agreement, including but not limited to any alleged violation of 17 enumerated statutes, as well as any other federal state or local law, regulation, or ordinance, and any public policy, contract, tort, or common law.  (Agreement ¶ 4.)  In

33

return, the Town agreed to pay Plaintiff six months severance pay and to maintain her current two-person health and dental insurance for a period of twelve months.  In addition, the Town agreed to provide as "additional consideration those items due per the Personnel Rules as contained in **Attachment A**."  (<u>Id.</u> ¶ 2 (underlining and bold in original).)  Attachment A set forth a list of eleven items, listed above.  The only item in dispute is item 7, "Withdrawal from Pension plan in accordance with plan. *(at a later date)."* (Attachment A ¶ 7 (italics indicate handwritten portions).

    30.  The Town maintains that "withdrawal from Pension plan" meant that Plaintiff had to withdraw her contributions but could not elect to take an annuity.  The Town's interpretation overlooks the rest of this provision, "in accordance with plan." It also ignores the plain language of the Settlement Agreement that Attachment A was a list of additional consideration being provided by the Town.  Attachment A did not represent any additional consideration being given by Plaintiff.

    31.  "[I]n accordance with the Plan," Plaintiff was a fully vested Participant, having completed more than five years of continuous service between July 1, 1997, when she became a full-time employee eligible to participate in the Plan, and July 4, 2003, when her employment terminated.  As such, her right to her normal retirement Pension was "nonforfeitable." (Plan § 4.01(a).)

She was "vested in, and [had] a nonforfeitable right to, a
percentage of her Accrued Benefit derived from Employer
contributions" by virtue of having completed her Vesting Service
of five years or more.  (Id. § 4.04(a) & (b).)

32.  A Participant who is vested and who terminates his or
her employment prior to his Normal Retirement Date, as did
Plaintiff, "may elect a refund of his own contributions plus
interest" (Id. § 4.04(e)(emphasis added)), which will revoke all
vested rights under the Plan and shall be in lieu of all other
benefits.  (Id.)  However, nothing in the Plan requires a vested
Participant to elect a refund.  He or she has a "nonforfeitable"
right to a normal retirement Pension payable as a single-life
annuity with 120 guaranteed payments (id. § 4.01(b)), or he or
she has the right to elect one of the optional forms of payment
set forth in Article V.  This interpretation is also consistent
with the provisions of the Summary Plan Description discussed
above.

33.  Thus, the Court concludes that sentence 7 of Attachment
A obligated the Town to pay Plaintiff's pension benefits "in
accordance with the Plan," when she chose to withdraw her
benefits at a later date.  She could elect to take a lump-sum
distribution of the contributions she had made plus interest or
she could elect a ten-year annuity, or any other annuity offered
by the Plan.  This is supported not only by the plain language of

the Settlement Agreement but also by the testimony of Finance Director Mehr.

34.  Defendant asserts that Plaintiff waived her rights to an annuity under the Plan.  Any such waiver must be both knowing and voluntary.  Linder v. BYK-Chemie USA, Inc., No. 3:02cv1956, 2006 WL 648206, at *6 (D. Conn. March 10, 2006).  The Linder case sets forth six factors that the Court should consider in determining whether the totality of the circumstances indicates that release of an ERISA claim was knowing and voluntary: (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the agreement before signing it; (3) the role of the plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the plaintiff was represented by an attorney, including whether the employer encouraged the employee to consult with an attorney and whether the employee had a fair opportunity to do so; and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law.  Id. at *7.

35.  Although this is not an ERISA case, the Court finds these factors apply here as well.  While Plaintiff is very well-educated and has extensive experience in counseling, she had little or no experience with pension matters and, despite being named to the Pension Committee, had little or no familiarity with

36

the Town's Pension Plan.  The Agreement was hastily thrown
together and is anything but a model of clarity.  Plaintiff was
pressured to sign the Agreement within 24 hours, despite a
provision in the Agreement that she had 21 days to consider it.
The Agreement was prepared by the Town and Town counsel.  Other
than negotiating the amount of her severance pay and insurance
benefits, Plaintiff had little role in deciding the terms of the
Agreement.  Unlike the Town, Plaintiff was not represented by
counsel, was not advised to secure counsel, and felt that she did
not have enough time to do so.  Lastly, and probably most
importantly, there is simply nothing to indicate that Plaintiff
was given anything in consideration for allegedly waiving her
nonforfeitable rights under the Pension Plan.  Thus, the Court
concludes that Plaintiff did not knowingly and voluntarily waive
any rights she had under the Plan.

36.  Accordingly, the Court grants Plaintiff's prayer for
declaratory relief and declares that Plaintiff, as a vested
Participant in the Town's Pension Plan, is entitled to receive a
pension under the Town's Pension Plan and that she may receive
those benefits in the form of an annuity or a lump-sum
distribution of the contributions she made plus interest, based
upon a hire date of July 1, 1997.

37.  The Court is convinced that there will be no need for
further judicial involvement in this matter and declines to

retain continuing jurisdiction over this case.  The Clerk is directed to entered Judgment in favor of Plaintiff and to close this file.

SO ORDERED, this ___4th___ day of ___September___,2009, at Bridgeport, Connecticut.


                                        _/s/ William I. Garfinkel_____
_____WILLIAM I. GARFINKEL,
                                        United States Magistrate Judge